The State v. Reid.

THE STATE v. REID.

1. The act of the 1st of February, 1839, " To suppress the evil practice of carrying weapons secretly," does not either directly, or indirectly tend to divest the citizen of the "right to bear arms in defence of himself and the State ;" and is, therefore consistent with the 23d section of the 1 Art. of the constitution.

THE defendant was indicted in the Circuit Court of Montgomery, for carrying concealed about his person, a certain species of fire arms, called a Pistol, contrary to the form of the statute, &c. To which he pleaded *not guilty*. Thereupon the case was submitted to a jury, who found the defendant *guilty*, and assessed a fine against him, of *fifty dollars*, for which sum the court rendered a judgment, and directed that he be imprisoned in the common jail, for the space of *six hours*, and thereafter, until the fine and costs were paid.

On the trial it was proved, that the defendant carried concealed about his person, a pistol. That while making a settlement as sheriff, he had been attacked by an individual of a dangerous and desperate character, who afterwards threatened his person,

The State v. Reid.

and came to his office several times to look for him. It was also proved, that these threats were communicated to the defendant, and the pistol brought to him by a friend, who conceived his life was in danger.

The defendant thereupon moved the court, to charge the jury, that the law on which the indictment was founded was unconstitutional, and that the defendant could not be convicted; which charge was refused by the court. The defendant then moved the court, to charge the jury, that if they believed from the evidence that the defendant carried the weapon concealed, for the purpose of defending his person, and that it was necessary to carry the weapon concealed for that purpose, then, they should acquit the defendant, which charge was also refused. Whereupon the court charged the jury, that the law upon which the indictment was founded, was constitutional, and that although the jury might believe from the evidence, that the defendant carried the weapon for the defence of his person, and although it was necessary for his defence that the weapon should be concealed, yet these facts would only go in mitigation, and did not constitute a complete defence. Which charge, as well as the refusal to give the several charges asked for, were at the request of the defendant referred to this court for its decision, as presenting novel and difficult questions of law.

The defendant then moved in arrest of judgment, on the ground, that the statute on which the indictment was founded was unconstitutional, which motion was overruled by the court, and the question of law thereupon arising referred to this court, as novel and difficult.

The *Attorney General for the State,* argued that it was competent for the Legislature to prohibit the wearing of *concealed weapons,* that such a law did not conflict with the constitutional provision, which guarantied to the citizen the right to bear arms in the defence of himself and the State. That the statute under which the defendant was convicted, did not impair that right, while it proposed to discountenance by punishment, a practice which had been greatly promotive of violence and bloodshed.

Every man was still left free to carry arms openly, the only man-
ner in which they could be used for defensive purposes.

*Mr. Goldthwaite* for the defendant, insisted that the act of the
Legislature on which the indictment was founded, abridges the
right secured to the citizen by the 23d section of the 1st article of
the constitution.    There is no restriction on the exercise of the
right, and as the grant is in general terms, the Legislature can-
not prescribe limits to it.    [1 Story on Con. 407—8: Sturgus v.
Crowninshield, 4 Wheat. Rep. 102—202: Bliss v. Common-
wealth, 2 Litt. Rep. 90.]    Has not a subsequent Legislature (if
the statute in question be constitutional) the right to prohibit the
carrying of arms openly, and both acts being in force, the right
of carrying arms at all, would be taken away.    Such a state of
things, all will admit, cannot exist without a violation of the
constitution.

The constitution of the United States, provides that the liber-
ty of the press shall not be abridged.    The authorities are clear
that no previous restraint shall be imposed upon publications.
[3 Story on Con. 736.]    The party publishing is responsible for
the abuse of the liberty.    [3 Story on Con. 742.]    So in regard
to the bearing of arms, the person making an improper use of
them is amenable to the laws, though he may carry them in any
manner he pleases.

COLLIER, C. J.—By the first section of the act, " to sup-
press the evil practice of carrying weapons secretly," [Acts of
1838—9.] it is enacted, " that if any person shall carry concealed
about his person, any species of fire arms, or any Bowie knife,
Arkansaw tooth pick, or any other knife of the like kind, dirk,
or any other deadly weapon, the person so offending, shall on
conviction thereof, before any court having competent jurisdic-
tion, pay a fine not less than fifty nor more than five hundred
dollars, to be assessed by the jury trying the case; and
be imprisoned for a term not exceeding three months, at the
discretion of the judge of said court." Under this section the
defendant was indicted, and he insists that it is repugnant to the
constitution of this State, which declares that, " Every citizen

has a right to bear arms, in defence of himself and the State," [23d sec., 1 Art. of the Con.] and is, therefore, inoperative and void.

A provision similar to that, with which the statute in question is said to come in collision, is contained in the constitutions of several of the States, and was doubtless suggested by the " *Bill of Rights*" of the 1 W. and M. which embodies many provisions in favor of the liberty of the subject, and is said to be for the most part, in affirmance of the common law. That enactment after declaring it against law, to raise or keep a standing army in the kingdom in time of peace, without the consent of Parliament, declares " that the subjects which are Protestants may have arms for their Defence, suitable to their Conditions and as allowed by law." [6 vol. Statutes of the Realm, 143: Crabb's Eng. Law, 570.]

The bill of rights was doubtless induced by the high prerogative claims of the Stuarts, even after the restoration of Chas. the II., but more especially by the extraordinary assumptions of Jas. the II., by which he attempted to assail the liberties and religion of the people, and to render inefficient the enactments of Parliament, by the exercise of a dispensing power.

The bill of rights, among other things confirms the declaration of rights, to which the Prince of Orange yielded his assent in the presence of both houses of Parliament, upon ascending the throne. That instrument recited the illegal and arbitrary acts committed by the late King, and declared almost in the terms of the recital, that such acts were illegal. The evil which was intended to be remedied by the provision quoted, was a denial of the right of Protestants to have arms for their defence, and not an inhibition to wear them secretly. Such being the mischief, the remedy must be construed only to extend so far as to effect its removal.

We have taken this brief notice of the English statute, as it may serve to aid us in the construction of our constitutional provision, which secures to the citizen the right to bear arms.

It was argued for the defendant that, where the constitution

grants a power, it must be understood to grant it entire; and in such a case, it will be incompetent for the Legislatuie to enact a law in derogation of it. The constitutional provision which we are to examine, cannot be considered as conferring either upon the Legislature, or the people any new or additional authority. The constitution of a State, is an instrument of restraint and limitation upon powers already plenary, so far as it respects the functions of government and the objects of legislation. We are then, to regard the provision in question, as a guaranty to the people of the right to bear arms, " in defence of themselves and the State," and an inhibition upon the Legislature to divest it by any enactment.

The question recurs, does the act, " To suppress the evil practice of carrying weapons secretly," trench upon the constitutional rights of the citizen. We think not. The constitution in declaring that, " Every citizen has the right to bear arms in defence of himself and the State," has neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guarantied to the citizen, is not to bear arms upon all occasions and in all places, but merely "in defence of himself and the State." The terms in which this provision is phrased seems to us, necessarily to leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals. The statute of 1 *Wm. and M.* while it declares the right of the subject, it refers to Parliament to determine what arms shall be borne and how; while our constitution being silent as to the action of the Legislature, does not divest it of a power over the subject, which pertained to it independent of an express grant.

We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly

unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.

We are aware that the court of Appeals of Kentucky, in Bliss v. Commonwealth, [2 Litt. Rep. 90.] attained a conclusion seemingly the opposite of that to which our judgments incline. In that case, the appellant was indicted under a statute which is in these words, " That any person in this commonwealth who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt or on the presentment of a grand jury; and a prosecutor in such presentment shall not be necessary. One half of such fine shall be to the use of the informer, and the other to the use of this commonwealth." The twenty-third section of the tenth article of the constitution of Kentucky, provides " that the right of the citizens to bear arms in defence of themselves and the State, shall not be questioned;" and the question before the court was, did the act of the Legislature impugn the right secured by the constitution.

The court considered that the right to bear arms, existed without any restriction, at the adoption of the constitution, and that the right of the " citizen" was as directly assailed by the provisions of the statute, as though they were forbid carrying guns on their shoulders, swords in scabbards, or when in conflict with an enemy were not allowed the use of bayonets. " If the act be consistent with the constitution" say the court, " it cannot be incompatible with that instrument, for the Legislature by successive enactments, to entirely cut off the exercise of the right of the citizens to bear arms. For in principle, there is no difference between a law prohibing the wearing concealed arms, and

a law prohibiting the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.

" We may possibly be told, that though a law of either description may be enacted consistently with the constitution, it would be incompatible with that instrument, to enact laws of both descriptions. But if either, when alone, be consistent with the constitution, which it may be asked, would be incompatible with that instrument, if both were enacted.

" The law first enacted would not be; for as the argument supposes, either may be enacted consistent with the constitution, that which is first enacted must, at the time of enactment, be consistent with the constitution; and if then consistent, it cannot become otherwise by any subsequent act of the Legislature.    It must, therefore, be the latter act, which the argument infers would be incompatible with the constitution.

" But suppose the order of enactment was reversed, and instead of being the first, that which was first, had been the last; the argument to be consistent should, nevertheless, insist on the last enactment being in conflict with the constitution. So that the absurd consequence would thence follow, of making the same act of the Legislature, either consistent with the constitution, or not so, according as it may precede or follow some other enactment of a different import. Besides, by insisting on the previous act producing any effect on the latter, the argument implies, that the previous one operates as a partial restraint on the right of the citizens to bear arms, and proceeds on the notion, that by prohibing the exercise of the residue of right not affected by the first act, the latter act comes in collision with the constitution. But it should not be forgotten, that it is not only a part of the right that is secured by the constitution; it is the right entire and complete, as it existed at the adoption of the constitution; and if any portion of that right be impaired, immaterial how small the part may be, and immaterial the order of time at which it may be done, it is equally forbidden by the constitution."

We have thought it proper to state thus at length, the argu-

ment employed by the court, in Bliss v. Commonwealth, because it places in a very strong point of view, the objection to the statute we are called on to examine. Whether the peculiar terms employed in the Kentucky constitution, viz: "That the right of the citizens to bear arms, &c. *shall not be questioned,*" influenced to any extent, the conclusion of the court, that the right could not be regulated, but must remain as it was at the time of its adoption, we are not prepared to say. Yet we are strongly inclined to believe, that the inhibition to question the right, was regarded as more potent than a mere affirmative declaration, intended to secure it to the citizen; and that while the one amounted to a denial of the right to legislate on the subject, the other would tolerate legislation to any extent which did not actually or in its consequences destroy the right to bear arms.

But the court say that it is a matter which will not admit of legislative regulation, and in order to test the correctness of its opinion, supposes one Legislature to prohibit the bearing arms secretly, and a subsequent Legislature to enact a law against bearing them openly; and then asks the question, whether the first, or last enactment would be unconstitutional. Under the provision of our constitution, we incline to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.

In respect to the two prohibitory enactments supposed by the court of Appeals of Kentucky, we should be disposed to think, if either one, when standing alone, would be constitutional, that the last would be regarded as an expression of the will of the Legislature when enacted, and as it could not operate in harmony with the first, would by implication, repeal it. This view, we think, accords with the decision of the supreme court of the United States, in Sturges v. Crowninshield, (4 Wheat. Rep. 122) in which the question arose, whether the Legislature of a State, possessed the constitutional right to enact a bankrupt law, inasmuch as the power to establish a general bankrupt law was con-

ferred upon Congress, by the constitution of the United States. The court were of opinion, that the right to adopt such a measure pertained to the Legislatures of the States, previous to the ratification of the Federal constitution, and that the insertion in that instrument, of an affirmative grant of power to Congress to legislate on the subject, did not *ipso facto*, divest the pre-existent right of the States, until Congress had exercised the power conferred; but when this was done, then the local laws would become inoperative.

Without further noticing the case of Bliss v. Commonwealth, it may be proper to remark, that it received the assent of but two of the judges of the court of appeals, while it was dissented from by the third.

In The State v. Mitchell (3 Blackf. Rep. 229,) it appears that the defendant was indicted under a section of a statute of Indiana, which is as follows: "That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars." (Laws of Indiana, ed. of 1831, p. 192.) It was insisted that this enactment was opposed to the constitution of Indiana, which declares "that the people have a right to bear arms for the defence of themselves and the State;" but the court decided against the objection, and held the act to be constitutional.

The difference between the terms used in the constitution of Indiana, and that of our own State, is so entirely immaterial, that it could not possibly authorize a difference of construction.

The cases cited, are the only adjudications we have been able to find, in regard to the right of the people to bear arms; and while the one sustains the constitutionality of the enactment in question, the other does not disprove it. But let it be conceded that it is doubtful, whether the statute does not come in collision with the constitution, yet it is our duty to maintain its validity. It has received the assent of the two houses of the General Assembly and the Governor, under a solemn pledge to support the constitution; and their opinion is at least, *prima facie* evidence,

that they have not overstepped the limits of legislative compe-
tency.   Before the judiciary can with propriety declare an act
of the Legislature unconstitutional, a case should be presented in
which there is no rational doubt.   (Bank of Newbern v. Taylor,
1 Caro. L. Repo. 246; *Ex parte* McCollum 1 Cow. Rep. 550.)

It appears from the case as referred to this court, that the de-
fendant moved the circuit judge "to charge the jury, that if they
believed from the evidence, that the defendant carried the weapon
concealed for the purpose of defending his person, and that it
was necessary to carry the weapon concealed for that purpose,
then, they should acquit the defendant; which charge was also
refused."   There was no evidence adduced, tending to show
that the defendant could not have defended himself as successful-
ly, by carrying the pistol openly. as by secreting it about his
person: it is difficult to conceive, how one could be placed in
such an attitude, consistently with the law which recognizes the
right of self-protection.   If the emergency is pressing, there
can be no necessity for concealing the weapon, and if the threat-
ened violence will allow of it, the individual may be arrested
and constrained to find sureties to keep the peace, or committed
to jail.   The charge asked for, was then upon an abstract point
of law.   .

In the case at bar, the defendant needed no arms for his pro-
tection, his official authority furnished him an ample shield.
In this country a sheriff possesses all the powers, which pertained
to his office at common law; except so far as they may have been
divested by statute, or such as are incompatible with the nature
of our institutions.   He is the keeper of the peace within the
county.   He may apprehend, and commit to prison, all persons
who break the peace, or attempt to break it; and may cause such
persons to be bound in a recognizance to keep the peace.   He
may, and is bound *ex officio*, to pursue and take all traitors, mur-
derers, felons, and rioters; he also hath the custody and safe-
keeping of the county jail; he is to defend the same against
rioters, and for this purpose, as well as for taking rioters and
others breaking the peace, he may call to his aid the *posse com-*

The State v. Reid.

*itatus,* or power of the county, and the citizens are bound to obey his summons, upon pain of fine and imprisonment. (1 Bla. Com. 343; Watson's Shff. 2.)

We will not undertake to say, that if in any case, it should appear to be indispensable to the right of defence that arms should be carried concealed about the person, the act " to suppress the evil practice of carrying weapons secretly," should be so construed, as to operate a prohibition in such case. But in the present case, no such necessity seems to have existed; and we cannot well conceive of its existence under any supposable circumstances.

We have only to add, that the judgment of the circuit court of Montgomery, is affirmed.